UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

S.W. and B.S., on behalf of P.W., a minor
child,

                                         Plaintiffs,

                    -against-

THE NEW YORK CITY DEPARTMENT OF
EDUCATION,

                                         Defendant.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

14-Cv-1754 (SHS)

OPINION & ORDER

SIDNEY H. STEIN, U.S. District Judge.

Plaintiffs S.W. and B.S. bring this action on behalf of their minor child
P.W. pursuant to the Individuals with Disabilities Education Improvement
Act, 20 U.S.C. § 1400, *et seq.* ("IDEA").[1] On July 16, 2013, Impartial Hearing
Officer ("IHO") Craig Tessler awarded plaintiffs full reimbursement for
P.W.'s tuition at the Stephen Gaynor School for the 2012–2013 school year.
However, four months later, in a thorough and careful twenty-two page
opinion, State Review Officer ("SRO") Justyn P. Bates reversed that
determination and found that no reimbursement was appropriate.
Plaintiffs now move for summary judgment in their favor, seeking an
order reversing the SRO's decision and reinstating the IHO's award of
reimbursement. Defendant, the New York City Department of Education
("DOE" or "the school district") cross-moves for summary judgment,
seeking an order upholding the SRO's decision and dismissing the
complaint. For the reasons set forth below, the parents' motion is denied
and the school district's motion is granted.

---

[1] Congress amended the IDEA by enacting the Individuals with Disabilities Education
Improvement Act of 2004 ("IDEIA"), Pub. L. No. 108–446, 118 Stat. 2647, which took
effect on July 1, 2005. Courts, however, continue to refer to the amended act as the
IDEA. Except where noted, the statutory citations in this Opinion are to the IDEA as
amended by the IDEIA.

## I.   LEGAL FRAMEWORK

Congress enacted the IDEA "to ensure that all children with disabilities have available to them a free appropriate public education that emphasizes special education and related services designed to meet their unique needs ... [and] to ensure that the rights of children with disabilities and parents of such children are protected." 20 U.S.C. § 1400(d)(1)(A)-(B); *see also Forest Grove Sch. Dist. v. T.A.*, 557 U.S. 230, 239–40 (2009) (discussing the purposes of the IDEA); *Winkelman ex rel. Winkelman v. Parma City Sch. Dist.*, 550 U.S. 516, 523 (2007) (same).

Additionally, the IDEA expresses a "strong preference for educating disabled students alongside their non-disabled peers; that is, in their least restrictive environment ('LRE')." *C.L. v. Scarsdale Union Free Sch. Dist.*, 744 F.3d 826, 831 (2d Cir. 2014) (citation and internal quotation marks omitted). States receiving federal funding under the IDEA are required to provide a free appropriate public education ("FAPE") to all children with disabilities. 20 U.S.C. § 1412(a)(1)(A).

To this end, the IDEA requires that the relevant local or state educational agency create an individualized education program ("IEP") at least annually for each disabled student. *Id.* § 1414(d)(2)(A). The IDEA envisions the IEP as "the centerpiece" of how a state delivers a FAPE. *Honig v. Doe*, 484 U.S. 305, 311 (1988). "That IEP must be developed in accordance with the procedures laid out in the IDEA, and must be 'reasonably calculated to enable the child to receive educational benefits.' " *T.M. ex rel. A.M. v. Cornwall Cent. Sch. Dist.*, 752 F.3d 145 (2d Cir. 2014) (quoting *Bd. of Educ. v. Rowley*, 458 U.S. 176, 207 (1982)).

In New York City, a Committee on Special Education ("CSE") develops each student's IEP. N.Y. Educ. L. § 4402(1)(b)(1). Parents are "members" of the CSE that formulates their child's IEP, *id. at* § 4402(1)(b)(1)(a), and the IDEA requires that they be provided an opportunity to present complaints with respect to the identification, evaluation, or placement of their child during the IEP process. 20 U.S.C. § 1415(b)(6)(A). Where parents believe that the school district has not adequately responded to their complaints, they may pursue their grievances through an "impartial due process hearing." *Id.* § 1415(f)(1)(A).

In New York, an IHO conducts these hearings, and parties who disagree with the IHO's decision may appeal to the SRO. *See* N.Y. Educ. L. § 4404; 20 U.S.C. § 1415(g)(1). The SRO's decision, in turn, may be challenged in either state or federal court. 20 U.S.C. § 1415(i)(2)(A). That court shall "receive the records of the administrative proceedings," "hear additional evidence," and "grant such relief as the court determines is appropriate" based on "the preponderance of the evidence" before it. *Id.* § 1415(i)(2)(C).

If a state receiving federal funding for special education fails to give a disabled child a FAPE under the IDEA, the child's parents or guardians may unilaterally place the child in an appropriate private school and seek tuition reimbursement from the state. *See Sch. Comm. of Burlington, Mass. v. Dep't of Educ.,* 471 U.S. 359, 369–70 (1985) ("*Burlington*"); *Florence County Sch. Dist. Four v. Carter ex rel. Carter,* 510 U.S. 7, 12 (1993) ("*Carter*"). Under the *Burlington–Carter* test for tuition reimbursement, "the parents will be entitled to reimbursement if (1) the school district's proposed placement violated the IDEA, (2) the parents' alternative private placement was appropriate, and (3) equitable considerations favor reimbursement." *T.M.,* 752 F.3d at 152.

## II.  Factual Background

The following facts from the administrative record are undisputed unless otherwise noted.

### A.  P.W.'s Educational History Through the 2011-2012 School Year

P.W., now twelve years old, has been classified by the DOE as a student with a learning disability (Compl. ¶ 19; Ans. ¶ 19) and is thus "a child with a disability" under the IDEA. *See* 20 U.S.C. § 1401(3)(A)(i). P.W. has been diagnosed with a reading disorder, a disorder of written expression, a mathematics disorder and a learning disorder "not otherwise specified." (Administrative Record, School District Exhibit 7 at 16.)[2] P.W. began attending P.S. 41 in kindergarten, which he repeated. (Impartial Hearing Transcript ("Tr.") at 385.)

---

[2] This Opinion will refer to plaintiffs' and defendant's exhibits in the administrative record as "Parents Ex." and "Sch. Dist. Ex.," respectively.

A CSE developed an IEP for P.W. in September 2011 and recommended a general education classroom with Special Education Teacher Services ("SETSS") five periods per week for English Language Arts, three of which were to be provided in a special education classroom, and two of which were to be provided in the general education classroom. (*See* Parents Ex. A ("2011-2012 IEP") at 6.) The September 2011 IEP also recommended two thirty-minute sessions per week of occupational therapy ("OT") in a small group. (*Id.* at 7) That IEP and program recommendation for the 2011-2012 school year are not at issue in this case. P.W.'s parents, however, remained concerned by what they viewed as his lack of academic progress and arranged for P.W. to be privately evaluated by Dr. Antoinette Lynn in November 2011. (*See* Sch. Dist. Ex. 7.) P.W.'s mother met with the school psychologist and principal in February 2012 to discuss Dr. Lynn's evaluation as well as P.W.'s mother's concerns about his academic performance. (Parents Ex. C; Tr. 51-53). Among other things, she was concerned that her child was falling behind as a result of being pulled out of class for SETSS services and that his writing skills were delayed. (Parents Ex. C.)

### B.   Development of the 2012-2013 IEP

The committee met again in April of 2012 to formulate P.W.'s educational program for the 2012-2013 school year. The committee was composed of plaintiff B.S., who is the child's step-father; Dr. Sherri Victor, the school psychologist; Patricia Belpanno, the child's SETSS provider; Lindsay Dennis-Litinger, his general education teacher; Gloria Degele, his occupational therapist; and Kelly Shannon, P.S. 41's principal. (*See* Sch. Dist. Ex. 3 ("2012-2013 IEP") at 14.) The resulting IEP recommended integrated co-teaching ("ICT") services in a general educational classroom at a community school for all of P.W.'s academic subjects and OT for thirty minutes twice a week. (*Id.* at 7-8.) The IEP also stated short and long-term goals for P.W. in the areas of writing legibility; speed and accuracy in completing reading, writing, and math assignments; solving word problems; and written composition. (*Id.* at 4-6.) An ICT classroom is made up of both disabled and non-disabled students taught by a general

education teacher and a special education teacher, and includes no more than twelve students with disabilities. *See* 8 N.Y.C.R.R. § 200.6(g); *see also M.W. ex rel. S.W.  v. New York City Dep't of Educ.*, 725 F.3d 131, 144-45 (2d Cir. 2013) (describing ICT classes).

In April 2012, the DOE issued a final notice of recommendation offering P.S. 41 as the specific school placement to implement the IEP recommendations for P.W. for the 2012-2013 school year. (Sch. Dist. Ex. 5.) P.W.'s mother visited a fourth-grade ICT class at P.S. 41 in May 2012 and expressed concerns about the size of the class (28 students) and the levels of special education support students receive. (Parents Ex. D; Tr. 393-97.) Dr. Lynn evaluated P.W. a second time in May 2012 and P.W.'s parents wrote the principal to share the results of the evaluation and inform the principal that in light of their concerns about the proposed placement, they were reserving a spot for P.W. at the Stephen Gaynor School. (Sch. Dist. Ex. 11; Parents Ex. E.) In response to S.W.'s letter, the principal met with S.W. in late July 2012 and discussed the possibility of adding SETSS to the ICT recommendation. (Sch. Dist. Ex. 12; Tr. 405-06.) S.W. wrote to the principal shortly after the meeting stating that she did not believe either ICT or ICT with SETSS would offer P.W. the level of support he required. (Parents Ex. F.)

S.W. wrote to the principal again in mid-August informing her that P.W. would begin the school year at the Stephen Gaynor School and that if after visiting the proposed ICT class in the fall, P.W.'s parents continued to believe that the placement was inappropriate for P.W., they would keep him at the Stephen Gaynor School and seek tuition reimbursement. (Parents Ex. H.) After visiting a fourth-grade ICT class at P.S. 41 in September 2012, S.W. reported that she believed it would not provide sufficient special education support and she finally rejected the DOE's proposed IEP and placement. (Parents Ex. I.) P.W.'s parents then requested an impartial hearing on the grounds that the DOE had failed to offer P.W. a FAPE for the 2012-2013 school year. (Sch. Dist. Ex. 1.) They also requested reimbursement for P.W.'s Stephen Gaynor tuition, transportation and related services. (*Id.*)

### C.   Proceedings before the Impartial Hearing Officer

The impartial hearing took place before IHO Tessler on six separate dates between January and May 2013. The DOE presented two witnesses: Dr. Sherri Victor—the school psychologist—and Kelly Shannon, P.S. 41's principal. Dr. Victor testified about the psychoeducational evaluation she had conducted, the IEP meeting that occurred on April 30, 2012, and her review of the two private neuropsychological evaluations of P.W. (Tr. at 45-162.)

Dr. Victor testified that when she evaluated P.W. in May of 2011, she classified him as learning disabled and found that he needed SETSS because although he was a "very verbally bright kid," he needed "more specific work" in phonemic awareness, decoding and math. (Tr. 66-67.) She reviewed Dr. Lynn's first psychoeducational evaluation in advance of the February 2012 meeting with his mother and noted that P.W. scored significantly lower in processing speed on Dr. Lynn's evaluation than he did on her own evaluation of him. (*Id.* at 74, 156.) She also testified that Dr. Lynn's recommendation of a small, special school was "very extreme," would be "too restrictive" for P.W., and did not seem supported by either Dr. Victor's evaluation, P.W.'s teacher's report or Dr. Lynn's own findings. (*Id.* at 75.)

Dr. Victor also testified about her participation in the IEP meeting on April 30, 2012. (*Id.* at 77-81.) She stated that in advance of the meeting, she reviewed documents which included Dr. Lynn's neurospsychological evaluation, the OT report and P.W.'s report card, and then drafted P.W.'s IEP with his providers and with the input of his teacher. (*Id.* at 77-78, 79-80.) Dr. Victor explained that she, P.W.'s teacher and his providers were in agreement that SETSS was appropriate for P.W., but the team recommended ICT to address the parental concerns and in light of what Dr. Victor characterized as Dr. Lynn's "dire" recommendation. (*Id.* at 83.) She explained that she believed the ICT recommendation was appropriate because the child would remain in the general education curriculum and because it would offer appropriate peer interaction for a student such as P.W. who is "socially very typical." (*Id.* at 84.)

Dr. Victor also testified that she reviewed Dr. Lynn's May 2012 psychoeducational evaluation of P.W. and found that in contrast to Dr. Lynn's conclusion that P.W. had failed to make progress, the results of the testing demonstrated that P.W. showed "a great deal of improvement" since Dr. Lynn had last evaluated him. (*Id.* at 104.) Dr. Victor supported this conclusion by explaining how P.W.'s scores in different areas of the Woodcock Johnson Tests of Achievement had either improved or stayed the same and stated that in her opinion, Dr. Lynn's second evaluation confirmed that it was appropriate for P.W. to remain "in a regular school." (*Id.* at 104-09.)

Ms. Shannon, who testified in the DOE's rebuttal case, discussed P.S. 41's responses to P.W.'s parents' communications with the school, which included arranging visits by P.W.'s mother to two ICT classrooms. (Tr. 490-502.)

Plaintiffs presented five witnesses, including themselves, Dr. Lynn and both a head teacher and an administrator at Stephen Gaynor, P.W.'s new school. Dr. Antoinette Lynn testified at length about the results of her November 2011 neuropsychological evaluation of P.W. She stated that while P.W. had strong verbal and perceptual reasoning scores, his working memory, processing speed,[3] written fluency and math fluency scores were significantly lower than those of his peers. (*Id.* at 200-07.) She diagnosed him with a reading disorder, a disorder of written expression, a mathematics disorder and a learning disorder "not otherwise specified" and recommended that he be transferred to a small, specialized school. (*Id.* at 207, 250-51.) After conducting a second evaluation in May 2012, Dr. Lynn found that although P.W. had made "some improvement" since she last evaluated him, he had not "made six months' progress in six months' time." (*Id.* at 213.) Dr. Lynn stated that in her opinion, an ICT placement would actually offer "less guided teaching" than SETSS and P.W. would "continue to be at risk for academic failure." (*Id.* at 215.)

---

[3] Dr. Lynn explained that a student with P.W.'s deficit in processing speed would likely have trouble copying from a board, be a slower reader and generally require extended time to complete all assignments. (*Id.* at 203-04.)

P.W.'s parents both testified before the IHO that they believed the DOE had denied their child a FAPE. P.W.'s stepfather, B.S. testified that P.W.'s deficits were discussed at the April 2012 IEP meeting, but he "d[idn't] believe" that IEP goals were discussed. (*Id.* at 354.) In response to the ICT recommendation, he voiced his concerns that an ICT class would be too large and would not provide sufficient support for P.W. (*Id.* at 355; 357-59.) He also reported that P.W. told him that during the April 2012 administration of statewide English Language Arts testing, Ms. Belpanno, his SETSS provider, instructed him to change some of his answers and correct spelling errors. (*Id.* at 351.) B.S. reported these allegations to the principal. (*Id.* at 352.) A DOE investigator issued a report on the incident more than a year later, in May 2013, which concluded that the allegation that Ms. Belpanno "assisted students and/or provided students with answers on the exam" was substantiated, but the allegation that she had changed P.W.'s answers in order to justify a recommendation of a less restrictive setting was not substantiated. (Parents Ex. T at 6.)

P.W.'s mother, S.W., testified that while receiving SETSS in the 2011-2012 school year, P.W. fell behind in math, made little progress in reading and writing, and suffered a decrease in self-esteem. (Tr. at 402-03.) S.W. also described her May and September 2012 visits to ICT classes at P.S. 41 and her concerns about class size and the sufficiency of the special education instruction. (*Id.* at 395-402.) According to S.W., P.W. has made marked improvement while at Stephen Gaynor, which she attributed to its small class size. (*Id.* at 410-12.)

Ann Miller, an administrator at the Stephen Gaynor School, testified about the composition and organization of the school, the services available to students and her supervision of P.W.'s teacher. (*Id.* at 271-78.)

Randi Sandler, the "head teacher" of P.W.'s class at Stephen Gaynor, reported that P.W. takes academic classes with small groups of other students with language-based learning disabilities and described the use of classroom techniques such as multisensory instruction. (*Id.* at 291, 293.) She reported that P.W.'s academic strengths include his background knowledge and expressive language and his weaknesses include written work, spelling, attention and his slow processing speed. (*Id.* at 290.) Ms.

Sandler described the various services and strategies his teachers and providers utilize to address his deficits and reported that since enrolling at Stephen Gaynor, P.W. has made "slow and steady progress."(*Id.* at 297.) It was her opinion that a large class environment would not meet P.W.'s needs because it would not provide sufficient support, attention and structure. (*Id.* at 313.)

### D.   The Impartial Hearing Officer's Decision

In his decision dated July 16, 2013, IHO Tessler found that the April 2012 IEP was both procedurally and substantively deficient and therefore the DOE had failed to offer P.W. a FAPE. He found that the lack of a parent member—an additional parent of a child with a disability—at the IEP meeting was a procedural violation, although not a violation that would, on its own, amount to a denial of a FAPE. (IHO Decision at 15.) He wrote that he did not "credit those portions of the IEP which refer to or are based upon 'Teacher Report,'" because any contributions by Ms. Belpanno, the SETSS provider who inappropriately assisted P.W. on state examinations, were "tainted" by the fact that she had "promoted cheating." (*Id.* at 15-16.) This was, in the IHO's opinion, "sufficient to discredit that teacher's estimate of a student's abilities and performance." (*Id.* at 16.) The IHO also found that the CSE had impermissibly predetermined the ICT recommendation in the IEP. (*Id.*)

The IHO also found the IEP substantively inadequate because an ICT class would not sufficiently address P.W.'s "significant deficits" in decoding, reading fluency, spelling, writing, math, attention and processing speed. (*Id.*) Only a small class environment with day-long interventions, according to the IHO, would meet P.W.'s needs. (*Id.*) Additionally, the IHO found the proposed placement at P.S. 41 inappropriate because the classes were too large and did not offer sufficient special education instruction and support. (*Id.*)

The IHO, however, rejected plaintiffs' argument that the IEP team did not properly utilize Dr. Lynn's November 2011 evaluation and found that "the academic performance and learning characteristics and academic management needs sections of the IEP are accurate insofar as they are based on those test results." (*Id.* at 15.) The IHO then concluded that

Stephen Gaynor was an appropriate placement for P.W. and that equitable considerations supported plaintiffs' claim for tuition. (*Id*. at 17) Finally, the IHO ordered the DOE to reimburse plaintiffs for the cost of P.W.'s Stephen Gaynor tuition for the 2012-2013 year. (*Id.* at 21.)

### E.   Appeal to the State Review Officer and His Decision

The DOE appealed that determination to the SRO and plaintiffs cross-appealed, arguing that if the IHO's conclusion was overturned, additional grounds existed that supported the finding of a denial of a FAPE, including that the DOE failed to adequately consider updated testing completed in May 2012. By decision dated November 15, 2013, SRO Bates annulled the IHO's decision and dismissed plaintiffs' cross-appeal. After a careful and thorough discussion of the evidence at the hearing before the IHO, the SRO found that the DOE had in fact provided a FAPE to P.W.

Specifically, the SRO found the IEP recommendation had not been predetermined, that the IHO's decision to discredit portions of the IEP based upon the SETSS provider's misconduct must be reversed, and that ICT classes were sufficient to meet P.W.'s needs and compliant with the IDEA's least restrictive environment mandate. (SRO Decision at 11-13, 16-18.) With respect to plaintiffs' cross-appeal, the SRO dismissed it on the basis that the April 2012 CSE relied on sufficient evaluative information to develop the IEP. (*Id*. at 13.) The SRO agreed with the IHO that the absence of an additional parent member at the IEP meeting, while concededly a procedural violation, did not amount to a failure to provide a FAPE. (*Id.* at 9-10.) Finally, the SRO found that the IHO's finding that the proposed placement was inadequate must be overturned because when a child is enrolled in a private placement prior to the implementation of the IEP, the validity of the proposed placement cannot be evaluated using speculative evidence concerning how the IEP might have been implemented. (*Id.* at 20-21.)

The SRO did not address the appropriateness of the private placement at Stephen Gaynor or whether equitable considerations favor reimbursement because he had concluded that the DOE had offered a FAPE.

### F.   This Action

Plaintiffs then commenced this action seeking (1) reversal of the SRO's November 15, 2013 decision, (2) reinstatement of the IHO's decision, (3) an award of $49,600 as reimbursement for P.W.'s tuition at Stephen Gaynor for the 2012-2013 school year, and (4) their reasonable attorney's fees and costs.

## III. DISCUSSION

### A.   Standard of Review

Although the parties have styled their submissions as motions for summary judgment, "the procedure [in IDEA actions] is in substance an appeal from an administrative determination, not a summary judgment." *Lillbask ex rel. Mauclaire v. Conn. Dep't of Educ.*, 397 F.3d 77, 83 n. 3 (2d Cir. 2005) (citation omitted). Accordingly, summary judgment in IDEA actions "often triggers more than an inquiry into possible disputed facts." *Id.* Rather, the court must conduct an "independent" review of the administrative record and base its decision on the "preponderance of evidence." *Rowley*, 458 U.S. at 205 (citation omitted). Summary judgment thus "serves as a pragmatic procedural mechanism for reviewing a state's compliance with the procedures set forth in the IDEA." *Lillbask*, 397 F.3d at 83 n. 3 (citation and internal quotation marks omitted).

However, "the role of the federal courts in reviewing state educational decisions under the IDEA is circumscribed," *T.Y., K.Y. v. N.Y. City Dep't of Educ.*, 584 F.3d 412, 417 (2d Cir. 2009) (citation omitted), *cert. denied,* 560 U.S. 904 (2010), and "courts may not 'substitute their own notions of sound educational policy for those of the school authorities which they review.'" *Id.* (quoting *Rowley*, 458 U.S. at 206). "While the district court must base its decision on the preponderance of the evidence, it must give due weight to the administrative proceedings, mindful that the judiciary generally lacks the specialized knowledge and experience necessary to resolve persistent and difficult questions of educational policy." *T.Y.*, 584 F.3d at 417 (citation omitted).

Deference is particularly warranted where, as here, the SRO's review has been "thorough and careful." *Walczak v. Fla. Union Free Sch. Dist.*, 142 F.3d 119, 129 (2d Cir. 1998). The district court should "defer to the final decision of the state authorities, even where the reviewing authority disagrees with the hearing officer." *A.C. & M.C. v. Bd. of Educ.*, 553 F.3d 165, 171 (2d Cir. 2009) (citation and internal quotation marks omitted). Thus, where "the SRO's decision conflicts with the earlier decision of the IHO, the IHO's decision may be afforded diminished weight." *Id.* (citation and internal quotation marks omitted).

### B. Tuition Reimbursement

As set forth above, the first element of the *Burlington-Carter* test for tuition reimbursement concerns whether an IEP complied with the IDEA. In evaluating this element, courts conduct a two-part inquiry that is, first, procedural, and second, substantive. At the first step, courts examine whether there were procedural violations of the IDEA, namely, "whether the state has complied with the procedures set forth in the IDEA." *Cerra v. Pawling Cent. Sch. Dist.*, 427 F.3d 186, 192 (2d Cir. 2005). Courts then examine whether the IEP was substantively adequate, i.e., whether it was "reasonably calculated to enable the child to receive educational benefits." *Id.* (citation and internal quotation marks omitted).

Here, plaintiffs contend that they are entitled to tuition reimbursement because, contrary to the SRO's findings, P.W. was denied a FAPE due to both procedural and substantive failures. The alleged procedural failures are (1) the absence of an additional parent member at the IEP meeting; (2) the predetermination of the IEP; and (3) the insufficiency and unreliability of the evaluative information the CSE relied upon. The alleged substantive failure is the inadequacy of the ICT recommendation.

### 1. Compliance with IDEA's Procedural Requirements

The initial procedural inquiry "is no mere formality, as adequate compliance with the procedures prescribed would in most cases assure much if not all of what Congress wished in the way of substantive content in an IEP." *A.C. ex rel. M.C. v. Bd. of Educ. of the Chappaqua Cent. Sch. Dist.*, 553 F.3d 165, 172 (2d Cir. 2009) (internal quotation marks omitted).

However, not every "procedural error in the development of an IEP renders that IEP legally inadequate under the IDEA." *Grim v. Rhinebeck Cent. Sch. Dist.*, 346 F.3d 377, 381 (2d Cir. 2003). Procedural errors will render an IEP inadequate only where those errors (1) impeded the child's right to a FAPE, (2) significantly impeded the parents' opportunity to participate in the decision making process regarding the provision of a FAPE, or (3) caused a deprivation of educational benefits. *See R.E. v. New York City Dep't of Educ.*, 694 F.3d 167, 190 (2d Cir. 2012)(citing 20 U.S.C. § 1415(f)(3)(E)(ii)). Multiple procedural violations may cumulatively result in the denial of a FAPE even if the violations considered individually do not. *Id.*

### a.   Absence of a Parent Member

Plaintiffs contend that P.W. was denied a FAPE in part because no additional parent member participated in the CSE meeting. At the time the CSE for P.W. was convened, New York state regulations required that a CSE include "an additional parent member," that is, "a parent of a student with a disability residing in the school district or a neighboring school district, provided such parent is not a required member if the parents of the student request that the additional parent member not participate in the meeting ...."[4] *E.F. v. New York City Dep't of Educ.*, No. 12-CV-2217, 2013 WL 4495676, at *13 (E.D.N.Y. Aug. 19, 2013)(quoting 8 N.Y.C.R.R. 200.3(a)(1)(viii)(pre-amendment)). It is undisputed that the CSE was improperly constituted due to the absence of such a parent. The relevant inquiry though, is what effect the absence of that additional parent member had on the adequacy of P.W.'s IEP and his parents' opportunity to participate in the decision-making process. *See R.E.*, 694 F.3d at 190.

---

[4] This provision was amended as of January 2, 2013, to require an additional parent member only if requested in writing by the parent, student or member of the committee at least 72 hours prior to the meeting. 2012 N.Y. Reg. 305185, 8 N.Y.C.R.R. 200.3 (Dec. 26, 2012).

Plaintiffs assert that because B.S., P.W.'s step-father, was less knowledgeable about P.W.'s educational needs and the IEP process than S.W., P.W.'s mother, who did not attend the meeting due to illness, the absence of an additional parent member was "especially significant." (Pl. Mem. in Support of Summary Judgment at 8.) As the SRO found, B.S.'s active participation in the CSE meeting belies this assertion. (SRO Decision at 10; *see also* Tr. at 357-59; 372 (B.S. testified that he raised his concerns about the ICT program at CSE meeting.)) Finally, the SRO noted that all of P.W.'s then-current providers in fact attended the April 2012 CSE meeting in addition to the principal and the district school psychologist, and therefore "it is unclear from the hearing record how an additional parent member could have contributed any more knowledge, expertise, or support to the parents than they already had available to them." (SRO Dec. at 10.) This Court agrees with both the SRO and the IHO that there is insufficient evidence in the hearing record to conclude that this procedural violation resulted in the denial of a FAPE or impeded the parents' right to participate in the IEP meeting.

### b.   Predetermination

Plaintiffs assert that they were denied meaningful involvement in the development of P.W.'s IEP because the IEP recommendations were predetermined. To support this assertion, plaintiffs point to the step-father's testimony that the principal told him before the CSE meeting that the members of the CSE planned on recommending an ICT class, and Dr. Victor's testimony that the CSE team came to the meeting with a draft IEP, which was not altered prior to finalization. (Tr. at 353, 135-36, 158-59).

School districts are permitted to come to the IEP meeting with a draft IEP as long as it has not been finalized and the district is still open to changes based on the parents' participation. *See M.M. ex rel. A.M. v. New York City Dep't of Educ. Region 9 (Dist. 2),* 583 F. Supp.2d 498, 506 (S.D.N.Y. 2008) ("[S]chool evaluators may prepare reports and come with pre formed opinions . . . as long as they are willing to listen to the parents and parents have the opportunity to make objections and suggestions.") (citation omitted); 34 C.F.R. §§ 300.501(b)(1) & (b)(3)(permitting school districts to engage in "preparatory activities ... to develop a proposal or

response to a parent proposal that will be discussed at a later meeting" without affording the parents an opportunity to participate at that time). It is clear from the record that the preparation members of the CSE team undertook prior to the CSE meeting did not evidence predetermination, but instead reflected an awareness of the seriousness of their task.

Regardless of the fact that the school district's personnel were of the opinion that participation in an ICT class was the appropriate recommendation for P.W. and had reached that opinion prior to the meeting (Tr. 158), the record demonstrates that the CSE team was responsive to the parents' concerns and that they, as Dr. Victor testified, came to the CSE meeting with an "open mind" as to their recommendation. (*Id.*) As Dr. Victor explained, the CSE team considered other programs before arriving at the recommendation for an ICT class. (Sch. Dist. Ex. 3 at 12-13; Tr. at 100-01, 366-67.) They considered keeping P.W. in the SETSS program, but rejected that option in light of P.W.'s parents' concerns that pulling him out of the classroom was adversely affecting his academic performance and in light of the results of Dr. Lynn's evaluation of P.W. (Sch. Dist. Ex. 3 at 12-13; Tr. at 83, 100, 366-67.)

They also considered a specialized class at a community school, but rejected that option as "way too restrictive" given P.W.'s "test scores," his "functioning within the classroom," and "the level of improvement he made since he started receiving services." (Tr. at 100-01; Sch. Dist. Ex. 3.) The step-father testified that when he expressed his concerns about the ICT recommendation at the IEP meeting, the CSE team responded to his concerns and explained why they believed that an ICT class would meet P.W.'s needs. (Tr. at 372.) In fact, even after the CSE meeting, the principal indicated her willingness to modify the IEP recommendation by adding SETSS to the ICT class because of P.W.'s parents' desire to have more small-group sessions. (Parents Ex. E, F; Sch. Dist. Ex. 12; Tr. at 404-05, 414-15, 428, 493-95.)

As for plaintiffs' argument that the finalization of the draft IEP without alterations indicates predetermination and therefore a lack of opportunity for parental participation, the record reflects that the parents and their expert had communicated their concerns and recommendations

to the CSE team prior to the actual CSE meeting, and therefore the draft IEP already reflected the parents' contributions to the formulation of the IEP. (*See* Sch. Dist. Ex. 3 at 1-2 (citing Dr. Lynn's evaluation) and *Id.* at 2, 3, 12, 13 (noting P.W.'s parents' concerns and placement preference)). The IDEA grants parents the right to provide input, not to have veto power.[5] *See T.Y. v. New York City Dep't of Educ.*, 584 F.3d 412, 420 (2d Cir. 2009); *see also P.K. ex rel. P.K. v. Bedford Cent. Sch. Dist.*, 569 F. Supp. 2d 371, 383 (S.D.N.Y. 2008) ("The fact that the District staff ultimately disagreed with the opinions of plaintiffs and their outside professionals does not mean that plaintiffs were denied the opportunity to participate in the development of the IEP's, or that the outcomes of the CSE meetings were 'pre-determined.' A professional disagreement is not an IDEA violation.") This Court agrees with the SRO's amply-supported finding that the IEP was not predetermined.

### c. Evaluative Information

Plaintiffs challenge the reliability and sufficiency of the evaluative material relied upon on the grounds that the CSE failed to consider adequately plaintiffs' private evaluations as required by the IDEA. They also contend that the participation of P.W.'s SETSS provider, Ms. Belpanno, tainted the IEP and its recommendations.

The IDEA requires that if a parent obtains an independent educational evaluation at the parent's expense, the results of that evaluation "must be considered by the public agency in any decision made with respect to the provision of a FAPE." 34 C.F.R. § 300.502(c). Consideration does not require substantive discussion, that every member of the CSE read the document, or that the CSE accord the private evaluation any particular weight. *See T.S. v. Bd. of Educ. of Town of Ridgefield*, 10 F.3d 87, 89-90 (2d Cir. 1993). Here, Dr. Victor, the school psychologist, testified that she reviewed

---

[5] As SRO Bates noted, if the CSE team had acceded to the parents' wishes for a small class in a specialized school they would have likely violated the IDEA's least restrictive environment mandate. (SRO Decision at 13.) As Dr. Victor testified, such a placement would have been "way too restrictive" because it would have unnecessarily "preclude[d] him from being around typically developing kids." (Tr. at 100, 140.)

Dr. Lynn's 2011 evaluation and the IEP itself references the findings of that evaluation in several areas. (*See* Sch. Dist. Ex. 3 at 1-2; Tr. at 95-96.) Indeed, Dr. Victor testified that she "absolutely" had used Dr. Lynn's report in developing the IEP. (Tr. at 96.) As both the IHO and the SRO found, the CSE adequately considered Dr. Lynn's 2011 neuropsychological evaluation. (IHO Decision at 15; SRO Decision at 15.)

Plaintiffs also urge that the April 2012 IEP is inadequate because the CSE did not consider Dr. Lynn's second evaluation, which the DOE received at least two months *after* the April IEP meeting. This argument is without merit. 34 C.F.R. § 300.502(c) only requires that the CSE consider any private evaluation *when* developing the IEP. The April 2012 IEP cannot be rendered inadequate on the grounds that it did not consider the May 2012 evaluation for the simple reason that the May 2012 evaluation had not been completed or rendered by the time the April 2012 IEP was finalized. *See D.A.B. v. New York City Dep't of Educ.*, 973 F. Supp. 2d 344, 361-62 (S.D.N.Y. 2013)(finding that a substantively adequate IEP cannot be rendered inadequate by an expert report that was not submitted to the CSE that developed the IEP).

The DOE's response to receiving Dr. Lynn's second report was not, as plaintiffs argue, inadequate. Plaintiffs cite to 8 NYCRR 200.4(e)(2) and 8 NYCRR 200.4(d) to support their assertion that when parents disagree with an IEP and request a formal meeting, the DOE is required to reconvene the CSE within 60 days. (Pl. Mem. in Opposition to Summary Judgment at 5.) The Court is unable to find any such requirement in those regulations.

In any event, the principal and P.S. 41 were responsive when plaintiffs provided them with Dr. Lynn's second evaluation. S.W. emailed Ms. Shannon on July 11, 2012 requesting a meeting to discuss Dr. Lynn's May 2012 evaluation. (Parents Ex. E.) Ms. Shannon met with S.W. on July 25, 2012 in response to that letter and informed her that the CSE may be able to add SETSS and additional OT to the ICT program recommendation. (Parents Ex. F; Sch. Dist. Ex. 12; Tr. 404-05, 414-15, 428, 493-95.) Ms. Shannon emailed S.W. the same day they met to reiterate that and provide contact information for special education support liaisons. (Sch. Dis. Ex.

12.) Ms. Shannon explicitly offered to reconvene the CSE and there is no evidence to suggest plaintiffs accepted this offer. (*Id.* ("I asked you to think about my proposal to reconvene our IEP team to possibly add SETSS to [P.W.'s] IEP to offer the level of support you believe [P.W.] will need."))

Finally, plaintiffs claim that the SRO improperly overturned the IHO's determination that Ms. Belpanno's participation discredited those portions of the IEP "which refer to or are based upon 'Teacher Report.'"[6] (IHO Decision at 15-16.) Although Ms. Belpanno's fitness as an educator is certainly called into question by the OSI investigator's finding that she improperly assisted students on statewide testing, the mere fact that she was involved in the development of the IEP did not impede P.W.'s access to a FAPE.

Even though Ms. Belpanno was involved in the development of the IEP, it is clear from the record that the IEP is based on a composite of information from a variety of other sources including P.W.'s general education teacher (Sch. Dist. Ex. 9; Tr. 87-88, 135-36); P.W.'s occupational therapist (Sch. Dist. Ex. 4; Tr. 135-36); and Dr. Victor (Tr. 112-13.) Contrary to the findings of the IHO, Ms. Belpanno's contributions cannot be identified and excised.[7] This is due in part to the structure of the IEP, but also to the fact that her observations give no indication of conflicting with

---

[6] An SRO must give deference to the IHO's findings as to the credibility of the witnesses testifying before the IHO unless other evidence or the record as a whole compels a contrary conclusion. *See M.W.*, 869 F. Supp. 2d at 330 (E.D.N.Y. 2012) *aff'd*, 725 F.3d 131 (2d Cir. 2013)(citing *Carlisle Area Sch. v. Scott P.*, 62 F.3d 520, 529 (3d Cir. 1995)). Although plaintiffs assert that in reversing the IHO's finding that Ms. Belpanno's participation discredited parts of the IEP, the SRO impermissibly reversed a credibility determination that "the IHO had derived from hearing testimony," (Pl. Opp. at 6), Ms. Belpanno never testified at the IHO hearing. As the SRO wrote, "the IHO's decision to discredit portions of the April 2012 IEP was not based on a credibility determination of a witness presented at the impartial hearing."(SRO Decision at 16.) Instead, the IHO discredited parts of the IEP that may have relied on Ms. Belpanno's input, the weight of which the SRO had the same ability to decide.

[7] The "Teacher Report" that the IHO's decision refers to—that is, the 2011-12 progress reports—give no indication that they were written by anyone other than P.W.'s regular education teacher, Ms. Dennis-Litinger, the only teacher whose name appears on those documents. (*See* Sch. Dist. Ex. 9.)

those of the other contributors. Although she did supply most of the information about P.W.'s performance in SETSS, Dr. Victor also observed P.W. in SETSS sessions and testified that her observations were consistent with Ms. Belpanno's reports of his performance. (*Id.* at 112-13, 149.) Furthermore, even if Ms. Belpanno's observations could be isolated, they should not be summarily dismissed, because the OSI investigator did not substantiate the allegation that she assisted P.W. in order to justify a less restrictive placement for him. (Parents Ex. T at 6.)[8]

Finally, as Dr. Victor testified, all the DOE members of the CSE were in agreement as to P.W.'s academic performance, the IEP's goals and the ICT recommendation. (Tr. at 83, 90, 92, 99, 140.) The information in the IEP about P.W.'s academic performance is corroborated by the hearing record. Accordingly, this Court affirms the SRO's well-reasoned finding that the CSE team relied on sufficient evaluative information and that Ms. Belpanno's participation did not result in the failure of the DOE to offer P.W. a FAPE.

### 2.   *Substantive Adequacy of the IEP*

An IEP is substantively adequate if it is "reasonably calculated to enable the child to receive educational benefits." *Rowley,* 458 U.S. at 207. The IDEA does not, however, require states to develop IEPs that "maximize the potential of handicapped children." *Id.* at 189. Indeed, a school district fulfills its substantive obligations under the IDEA if it provides an IEP that is "likely to produce progress, not regression," and that "affords the student with an opportunity greater than mere trivial advancement." *T.P. ex rel. S.P. v. Mamaroneck Union Free Sch. Dist.,* 554 F.3d 247, 254 (2d Cir. 2009)(citation and internal quotation marks omitted).

The IDEA only guarantees an "appropriate" education, "not one that provides everything that might be thought desirable by loving parents." *Walczak v. Florida Union Free Sch. Dist.,* 142 F.3d 119, 132 (2d Cir. 1998)

---

[8] The results from the state testing in question were not available at the time of the April 2012 IEP meeting, and therefore could not have been used in any way. (*See* Parents Ex. G dated August 10, 2012 (reporting that the family had "just received the state test scores for [P.W.]."))

(internal citation omitted). "Because administrative agencies have special expertise in making judgments concerning student progress, deference is particularly important when assessing an IEP's substantive adequacy." *Cerra*, 427 F.3d at 195. Unlike procedural inadequacy, substantive inadequacy automatically entitles the parents to reimbursement if the other *Burlington-Carter* elements are met. *See R.E.,* 694 F.3d at 190 (citation omitted).

Here, the SRO found that the IEP was substantively adequate. In reaching this conclusion, the SRO cited Dr. Victor's testimony that an ICT class was appropriate for P.W. because he would receive instruction in the general education curriculum, because he was "socially very typical" and because an ICT class would enable him to interact with his typically developing peers and still allow him to receive special education modifications. (Tr. at 84.) Dr. Victor also pointed out additional strategies and support recommended in the IEP to address the child's processing speed and attention deficits such as the use of graphic organizers, multi-modal delivery of instruction and simplified language in directions. (Tr. at 86-87; Sch. Dist. Ex. 3 at 3.) The SRO then highlighted the CSE's finding that a special class placement option was "way too restrictive" and that P.W. "did not need that kind of level of intervention." (Tr. at 100.) These conclusions were based on P.W.'s test scores, his functioning within both the general education and SETSS classrooms and "the level of improvement he had made since he started receiving services." (*Id.* at 100-01.)

The SRO's own review of the records also supported the IEP's ICT recommendation. He pointed to Dr. Lynn's November 2011 evaluation which described P.W. as "articulate and socially engaging," and reported test results demonstrating that P.W.'s strengths included his "superior range abilities in verbal reasoning" and "high average perceptual reasoning abilities." (SRO Dec. at 19 (citing Sch. Dist. Ex. 7 at 5-6, 8-10.)) The SRO also cited P.W.'s March 2011-12 progress report which indicated that the boy met grade level standards in many areas related to reading, writing, speaking, listening and mathematics and exceeded grade level standards in the area of social/emotional functioning. (SRO Dec. at 19

(citing Sch. Dist. Ex. 9 at 2-3)). The SRO concluded that "the ICT services recommended in the April 2012 IEP were tailored to address the student's needs and offered the student a FAPE in the [least restrictive environment] for the 2012-13 school year." (SRO Decision at 20.)

Plaintiffs disagree, and seek reinstatement of the IHO's determination that because of P.W.'s "significant deficits in decoding, reading fluency, spelling, writing and math," and "poor attention and slow processing speed," he required "a small class environment" and an ICT class "would be too large and distracting and would not offer sufficient 1:1 attention and small group instruction." (IHO Decision at 16.) They contend that P.W.'s delays necessitated placement in a small, specialized class. Plaintiffs' concerns regarding class size and instructional programming are matters of educational policy, better suited to resolution by a state educational administrative officer rather than the courts. *See Rowley,* 458 U.S. at 206 (independent review is "by no means an invitation to the courts to substitute their own notions of sound educational policy for those of the school authorities which they review"); *Grim,* 346 F.3d at 383 (A court may not "cho[ose] between the views of conflicting experts on a controversial issue of educational policy ... in direct contradiction of the opinions of state administrative officers who had heard the same evidence.") Courts have specifically identified the question of whether SETSS or ICT services are appropriate as one of these issues of educational policy where a certain degree of deference is appropriate. *See e.g., W.W. v. New York City Dep't of Educ.,* No. 12 CIV. 7196, 2014 WL 1330113, at *14 (S.D.N.Y. Mar. 31, 2014)("Whether an education program such as SETSS or ICT is appropriate for a particular student is a question best left to the educational authorities.")

The SRO's decision is well reasoned and supported by the administrative record. It also appropriately takes into account the IDEA's "strong preference for children with disabilities to be educated, to the maximum extent appropriate, together with their non-disabled peers." *Walczak,* 142 F.3d at 122 (internal citation and quotation marks omitted). It is appropriate that this Court defer to the SRO on this issue. *See R.E.,* 694 F.3d at 189 ("[A] court must defer to the SRO's decision on matters

requiring educational expertise unless it concludes that the decision was
inadequately reasoned, in which case a better-reasoned IHO opinion may
be considered instead.")

Because the Court finds that P.W.'s IEP was not substantively
deficient and the absence of an additional parent member at the CSE
meeting did not result in the denial of FAPE, it does not reach the issues of
whether private placement at the Stephen Gaynor School was appropriate
or whether equitable considerations favor reimbursement.

### 3.  *Appropriateness of the Placement*

Plaintiffs challenge the appropriateness of P.W.'s proposed placement
in an ICT class at P.S. 41. They seek reinstatement of the IHO's decision
which relied on S.W.'s observations of two ICT classes at P.S. 41 to find
that the proposed placement was inappropriate because the classes were
too large and did not offer sufficient special education instruction and
support. The SRO reversed this finding because it found that these issues
were speculative in light of the fact that plaintiffs rejected the April 2012
IEP and unilaterally moved P.W. in a private school prior to the actual
implementation of the IEP. (SRO Decision at 21.)

Generally, where—as here—parents remove a child from a public
school prior to the implementation of the IEP, the sufficiency of the DOE's
offered program must be determined on the basis of the IEP itself. *See R.E.,*
694 F.3d at 187 ("In determining the adequacy of an IEP, both parties are
limited to discussing the placement and services specified in the written
plan.") In *R.E.,* the United States Court of Appeals for the Second Circuit
wrote that "[s]peculation that the school district will not adequately
adhere to the IEP is not an appropriate basis for unilateral placement." 694
at 195. "[T]he appropriate forum for such a claim is 'a later proceeding' to
show that the child was denied a free and appropriate public education
'because necessary services included in the IEP were not provided in
practice.' " *F.L. ex rel. F.L. v. New York City Dep't of Educ.,* 553 F. App'x 2, 9
(2d Cir. 2014) (quoting *R.E.,* 694 F.3d at 187 n. 3). At the same time
however, school districts "do not have carte blanche" to assign a child to a

school "that cannot satisfy the IEP's requirements." *T.Y. v. New York City Dep't of Educ.*, 584 F.3d 412, 420 (2d Cir. 2009).

District courts have reached differing conclusions as to their role in evaluating the ability of schools to comply with an IEP in cases where parents unilaterally choose to place their child in a private school prior to the implementation of the IEP. Some courts have read *R.E.* broadly enough to exclude all prospective challenges to a child's proposed placement. *See e.g.*, *B.P. v. New York City Dep't of Educ.*, No. 14 CIV. 1822, 2014 WL 6808130 (S.D.N.Y. Dec. 3, 2014)(finding that although a school could not provide speech and OT sessions in the manner indicated in the IEP and a school social worker told the parents the school was inappropriate for their child, "a challenge to the district's choice of school is improper where the student never attended the school").

Other courts have interpreted *R.E.* to provide for a narrow exception where the proposed placement was "factually incapable" of implementing the IEP or the proposed placement told the parent of its "plans to contravene the IEP." *N.S. v. New York City Dep't of Educ.*, No. 13-CV-7819, 2014 WL 2722967, at *12 (S.D.N.Y. June 16, 2014); *see also D.C. ex rel. E.B. v. N.Y. City Dep't of Educ.*, 950 F.Supp.2d 494 (S.D.N.Y.2013)(finding denial of FAPE where the IEP required a seafood-free environment and an administrator told the parent that such an environment was not available); *Scott ex rel. C.S. v. New York City Dep't of Educ.*, No. 12 CIV. 3558, 2014 WL 1225529 (S.D.N.Y. Mar. 25, 2014)(finding a denial of FAPE where the IEP required a 12:1:1 student to teacher to paraprofessional classroom and DOE staff told plaintiff that her child would be placed in a 6:1:1 class); *B.R. ex rel. K.O. v. New York City Dep't of Educ.*, 910 F. Supp. 2d 670, 677 (S.D.N.Y. 2012)(finding that where the assistant principal testified that OT was provided in small groups instead of 1:1 as required by the IEP, the DOE failed to offer a FAPE).

This Court need not—and should not—take a position on this issue, because plaintiffs have not met the criteria for this narrow exception.[9]

---

[9] Plaintiffs bear the burden of proof on prospective challenges to the adequacy of a proposed placement. *See N.S.*, 2014 WL 2722967, at *13 (Once the school district has established that a student's IEP is substantively and procedurally adequate, "[i]t is

Plaintiffs assert that when the mother visited two ICT classes at P.S. 41, it was her "understanding" that the special education teacher and the general education teacher were both in the classroom only for English and math, not for all subjects as required by P.W.'s IEP. (*See* Parents. Ex. D.) Not only does the record not reflect what the basis of her understanding was, but also, at the hearing before the IHO, P.S. 41's school psychologist testified that the ICT classes were taught by both a special education teacher and a general education teacher, and that students would have access to special education support whenever they needed it. (*See* Tr. at 82.) Plaintiffs' belief to the contrary does not suffice to establish that P.S. 41 was factually incapable of implementing the IEP or that P.S. 41 had stated that it intended to contravene the IEP.

## IV. CONCLUSION

For the reasons set forth above, this Court finds, giving appropriate deference to the careful review by the State Review Officer, that the DOE offered P.W. a free and appropriate public education and that plaintiffs' speculative challenge to the appropriateness of P.W.'s proposed placement fails. Therefore, plaintiffs' motion for summary judgment is denied and defendant's motion for summary judgment is granted. The Clerk of Court shall enter judgment accordingly.

Dated: New York, New York
      March 12, 2015

SO ORDERED:

Sidney H. Stein, U.S.D.J.

---

then incumbent on the parents to establish that the school district would not have adhered to the written plan."); *R.C. ex rel. M.C. v. Byram Hills Sch. Dist.*, 906 F. Supp. 2d 256, 273 (S.D.N.Y. 2012); *but see B.R. ex rel. K.O.*, 910 F. Supp.2d 670, 678 (S.D.N.Y. 2012).